# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DOMINIC L. ROBINSON

VERSUS

N. BURL CAIN, WARDEN LOUISIANA
STATE PENITENTIARY

CIVIL ACTION

NO.  07-3651

SECTION "B"(4)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **Title 28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I.    Factual and Background

The petitioner, Dominic L. Robinson ("Robinson"), is a convicted inmate presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On October 29, 2001, Robinson was charged by a four count bill of information in Terrebonne Parish with the attempted

---

[1]Under Title 28 U.S.C. § 2254(e)(2), an Evidentiary Hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1.

second degree murder of Joseph Boudreaux, Jr., the attempted second degree murder of Jason Kaylor, carjacking, and the aggravated kidnapping of Jason Kaylor.[3]

The record reflects that on August 28, 2001, between 7:00 and 7:30 p.m., the victims Kaylor and Boudreaux drove to the Southland Mall in Houma, Louisiana in Kaylor's car.[4] Kaylor's car was a black 1992 Nissan Stanza with many extras and add-on features, including television sets, a Playstation, and specialized audio equipment. As the two men were heading to the car to leave the mall at around 8:45 p.m., they noticed two men and a child standing nearby. As he approached the car, Kaylor unlocked it using a remote device. Before he was able to get into the car, one of the men, later identified as Robinson, held a gun to his back and told him that he was being carjacked.

The second man, Christian Hill, approached Boudreaux on the passenger side of Kaylor's car and told him to get into the car. He also instructed Boudreaux to move things off of the backseat so they all could get into the car. As Boudreaux complied, Kaylor reached under the driver's seat for his gun. Kaylor began to struggle with Robinson, who hit Kaylor in the head several times with his weapon. During the struggle, Robinson fired his gun into the car toward Kaylor. The bullet scraped Kaylor's neck and hit Boudreaux in the side. Boudreaux managed to escape, and he ran to a Rite-Aid drugstore to get help.

Hill also left the scene with the small child and drove off in another car. Robinson was able to take away Kaylor's gun, and he jumped into the passenger side of the car. He forced Kaylor to drive away. Witnesses who saw the carjacking took down the license plate of Kaylor's vehicle and the vehicle used by Hill to leave the scene.

---

[3]St. Rec. Vol. 1 of 7, Bill of Information, 10/29/01.

[4]These facts were taken from the Trial Court's Reasons for Judgment addressing Robinson's application for post-conviction relief. St. Rec. Vol. 6 of 7, Reasons for Judgment, pp. 2-3, 12/14/05.

Robinson forced Kaylor to drive towards Highway 90 heading to New Orleans. On the way to New Orleans, Robinson continued to hit Kaylor on the head and threaten him with the gun. At some point, Robinson fired Kaylor's gun into the front dashboard of the car. Once they reached the Luling bridge, they stopped the car. Robinson took Kaylor's wallet and shoes and forced him into the trunk. After Robinson continued to drive around for several hours, he released Kaylor near Slidell. Kaylor was able to call for help, and he was transported to North Shore Regional Hospital Emergency Room where he was treated for his injuries.

Robinson was tried before a jury on November 4, 5, and 6, 2002, and he was found guilty as charged of attempted second degree murder of Kaylor, carjacking, and aggravated kidnapping.[5] The jury also found him guilty of the lesser included offense of attempted manslaughter of Boudreaux.[6] His counsel filed a motion for judgment notwithstanding the verdict on the aggravated kidnapping charge.[7] The Trial Court denied the motion on December 3, 2002.[8]

Thereafter, on December 16, 2002, the Trial Court sentenced Robinson to serve concurrent sentences of 20 years for attempted manslaughter, 50 years without benefit of parole, probation, or suspension of sentence for attempted second degree murder, 20 years without benefit of parole, probation, or suspension of sentence for carjacking, and life imprisonment without benefit of parole,

---

[5]St. Rec. Vol. 1 of 7, Trial Minutes, 11/4/02; Trial Minutes, 11/5/02; Trial Minutes, 11/6/02; Verdict Form #1, 11/6/02; Verdict Form #2, 11/6/02; Verdict Form, #3, 11/6/02; St. Rec. Vol. 2 of 7, Trial Transcript, 1/4-6/02; St. Rec. Vol. 3 of 7, Trial Transcript (continued), 1/4-6/02; St. Rec. Vol. 4 of 7, Trial Transcript (continued), 1/4-6/02.

[6]St. Rec. Vol. 1 of 7, Verdict Form #4, 11/6/02.

[7]St. Rec. Vol. 2 of 7, Motion for Judgment Notwithstanding the Verdict of Aggravated Kidnapping, 11/27/02.

[8]St. Rec. Vol. 1 of 7, Minute Entry, 12/3/02; St. Rec. Vol. 2 of 7, Trial Court Order, 12/3/02; Hearing Transcript, 12/3/02.

probation, or suspension of sentence for aggravated kidnapping.[9]  Robinson later filed a motion for a new trial, which was denied by the Trial Court on December 20, 2002.[10]

Four months later, on April 29, 2003, Robinson's counsel filed a motion requesting leave to file an out of time appeal, and the Court granted the motion.[11]  *See Jiminez v. Quarterman*, __ U.S.__, 129 S. Ct. 681, 686-87 (2009) (where a state court grants a criminal defendant the right to file an out-of-time appeal during state collateral review, his judgment is not yet final for purposes of seeking federal habeas review).

On appeal, Robinson's counsel argued that the evidence was insufficient to prove aggravated kidnapping and requested the court to conduct an errors patent review regarding the State's failure to charge the aggravated kidnapping by grand jury indictment.[12]

On December 30, 2004, the Louisiana First Circuit Court of Appeal affirmed the convictions and sentences for attempted manslaughter, attempted second degree murder, and carjacking.[13] However, under its errors patent review, the Court reversed the aggravated kidnapping charge because it had not been charged by a grand jury indictment.[14]

Robinson did not seek further review of the appellate court's decisions.  His convictions became final thirty days later, on Monday, January 31, 2005. *See Roberts v. Cockrell*, 319 F.3d 690,

---

[9]St. Rec. Vol. 1 of 7, Sentencing Minutes, 12/16/02; St. Rec. Vol. 2 of 7, Sentencing Transcript, 12/16/02.

[10]St. Rec. Vol. 1 of 7, Minute Entry, 12/20/02; St. Rec. Vol. 2 of 7, Motion for New Trial, 12/20/02; Trial Court Order, 12/20/02; Hearing Transcript, 12/20/02.

[11]St. Rec. Vol. 4 of 7, Motion for Out of Time Appeal, 4/29/03; Trial Court Order, 4/28/03.

[12]St. Rec. Vol. 5 of 7, Appeal Brief, 2004-KA-0144, 6/15/04; Supplemental Appeal Brief, 2004-KA-0144, 10/5/04.

[13]*State v. Robinson*, 890 So. 2d 36 (La. Ct. App. 2004) (Table); St. Rec. Vol. 5 of 7, 1st Cir. Opinion, 2004-KA-0144, p. 2, 12/30/04.

[14]St. Rec. Vol. 5 of 7, 1st Cir. Opinion, 2004-KA-0144, pp. 2-3, 12/30/04.

694-95 (5th Cir. 2003) (under federal habeas law, a conviction and sentence are final when the state defendant does not timely proceed to the next available step in the state appeal process); La. S. Ct. R. X§5(a) (an application seeking review of the judgment of the court of appeal shall be filed or postmarked within 30 days of the issuance of the appellate court's judgment); *see also Jiminez*, 129 S. Ct. at 686-87; La. Code Crim. Proc. Ann. art. 13 (2009) (weekends and holidays not included in a calculation of period when it would otherwise be the last day of the period).

Almost four months later, Robinson filed an application for post-conviction relief in the state trial court raising four grounds for relief:[15] (1) insufficient evidence of specific intent to kill in connection with the attempted manslaughter of Boudreaux and the attempted second degree murder of Kaylor; (2) the Trial Court gave an improper jury instruction on attempted second degree murder and attempted manslaughter which included the phrase "or inflict great bodily harm;" (3) counsel was ineffective when he failed to object to the erroneous jury instructions; and (4) the convictions for carjacking and attempted manslaughter violated the prohibition against double jeopardy.

On December 15, 2005, the Trial Court entered a judgment finding that the evidence was sufficient to establish a specific intent to kill to support the attempted second degree murder charge.[16] However, the court found that the attempted manslaughter charge must have been based on the jury's findings of unintentional acts arising from the felony-murder doctrine. The court held that the jury was prohibited from using the underlying carjacking felony as a basis for the attempted manslaughter and render a verdict of guilty on both counts. Accordingly, the court set aside the attempted manslaughter conviction.

---

[15]St. Rec. Vol. 5 of 7, Uniform Application for Post-Conviction Relief, 6/6/05 (signed 5/25/05); *see also*, Motion to Supplement, 7/5/05.

[16]St. Rec. Vol. 6 of 7, Trial Court Judgment, 12/15/05 (signed 12/14/05); Reasons for Judgment, 12/14/05.

The Trial Court went on to find that, although the trial court erred in including the great bodily harm component in its definition of second degree murder and manslaughter, the error was harmless since the evidence established a specific intent to kill and was not based on an intent to inflict great bodily harm. The Court resolved that the error was not prejudicial and also did not serve as a basis for an ineffective assistance of counsel claim. Finally, the Court resolved that the double jeopardy argument was moot because the court had already set aside the attempted manslaughter conviction.

On January 25, 2005, Robinson submitted a timely writ application with the Louisiana First Circuit seeking review of the Trial Court's judgment except for the granting of relief on the attempted manslaughter conviction.[17] The Court denied the application without reasons on May 1, 2006.[18] The Louisiana Supreme Court, on March 16, 2007, also denied without reasons Robinson's related writ application filed in that Court.[19]

## II.    **Federal Petition**

On July 5, 2007, the Clerk of Court filed Robinson's petition for federal habeas corpus relief, in which raised three grounds for relief:[20] (1) insufficient evidence to sustain the verdicts of attempted second degree murder and attempted manslaughter; (2) an erroneous jury instruction was given to the jury defining attempted second degree murder and attempted manslaughter with the

---

[17]St. Rec. Vol. 7 of 7, 1st Cir. Writ Application, 2006-KW-0185, 1/26/05; *see also* St. Rec. Vol. 6 of 7, Notice of Intent, 1/26/05 (signed 1/13/06); Trial Court Order, 1/30/06 (signed 1/27/06), granting Robinson until February 13, 2006, to file a writ application.

[18]St. Rec. Vol. 7 of 7, 1st Cir. Order, 2006-KW-0185, 5/1/06.

[19]*State ex rel. Robinson v. State*, 952 So. 2d 690 (La. 2007); St. Rec. Vol. 7 of 7, La. S. Ct. Order, 2006-KH-1515, 3/16/07; La. S. Ct. Writ Application, 06-KH-1515, 6/14/06 (signed 5/15/06).

[20]Rec. Doc. No. 1.

phrase "or intent to inflict great bodily harm;" and (3) ineffective assistance of counsel as a result of trial counsel's failure to object to the erroneous jury instruction.[21]

The State filed a response in opposition to Robinson's petition arguing that his claims are without merit and otherwise moot with respect to any claim related to the vacated conviction for attempted manslaughter.[22]

## III.   <u>General Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[23] applies to this petition, which is deemed filed in this court under the federal mailbox rule on June 25, 2007.[24]   The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was

---

[21]Robinson listed a fourth claim that he suffered "double jeopardy regarding the use of car-jacking to support the attempted manslaughter charge." Rec. Doc. No. 1-2, p. 3. In spite of this, Robinson withdrew the ground for relief in the same pleading: "Issue #4 that was raised in petitioner's original application for post-conviction relief was considered and sufficiently granted at the trial court level of this proceeding and will not be pursued further." Rec. Doc. No. 1-2, p. 30. In addition, as discussed later in this opinion, Robinson is not in custody for purposes of seeking federal habeas relief on the attempted manslaughter conviction because it was vacated by the state courts. *Maleng v. Cook*, 490 U.S. 488, 490 (1989) (habeas relief <u>only</u> available for persons "in custody" in violation of the Constitution or laws or treaties of the United States.); *Dickerson v. Louisiana*, 816 F.2d 220, 224 (5th Cir. 1987) (To be eligible for federal habeas corpus relief, a petitioner must be "in custody" and have exhausted state court remedies).

[22]Rec. Doc. No. 7.

[23]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[24]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Robinson's federal habeas petition on July 5, 2007, when the filing fee was paid. Robinson dated his signature on the petition on June 25, 2007. This is the earliest date on which he could have delivered it to prison officials for mailing. The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition. *See Cousin v. Lensing*, 310 F.3d 843, (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)).

The State concedes, and the record shows, that Robinson's petition is timely and that his claims are exhausted and not in procedural default. The claims will be addressed on the merits.

## IV.    <u>Standards of Review on the Merits</u>

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either (1) correctly identifies the governing rule but then applies it unreasonably to the facts, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304 (1992). The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *See, e.g.*, *id.* at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Thus, under the "unreasonable application" determination, the court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641

(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

## V.      Insufficient Evidence

Robinson alleges that the State's evidence failed to prove beyond a reasonable doubt that he had specific intent to kill Boudreaux or Kaylor to support the convictions for attempted manslaughter of Boudreaux and attempted second degree murder of Kaylor.

Before proceeding to the merits of this claim, the Court must consider that Robinson is not in custody for the attempted manslaughter of Boudreaux. The conviction was vacated by the state courts on December 15, 2007, prior to the filing of this petition. Because he is not in custody for that conviction, he is not entitled to habeas corpus relief in connection therewith.[25] This court is without jurisdiction to consider Robinson's arguments in connection with the attempted manslaughter charge. The Court, therefore, will consider the sufficiency of the evidence to support the attempted second degree murder of Kaylor.

Robinson first raised this claim in his application for post-conviction relief filed in the state trial court. Relying on the holding in *Jackson v. Virginia*, 443 U.S. 307 (1979), and related state law, the Trial Court found that the evidence at trial was sufficient to prove that Robinson had a specific intent to kill Kaylor. Specifically, the evidence proved that Robinson was the shooter and

---

[25]Title 28 U.S.C. § 2241(d) "gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Maleng v. Cook*, 490 U.S. 488, 490 (1989) (quoting 28 U.S.C. § 2241(c)(3) (2006)) (emphasis added); 28 U.S.C. § 2254(a) (2006); *Dickerson v. Louisiana*, 816 F.2d 220, 224 (5th Cir. 1987) (To be eligible for federal habeas corpus relief, a petitioner must be "in custody" and have exhausted state court remedies). The United States Supreme Court has interpreted this statutory language to require that the habeas petitioner be "in custody" for the conviction or sentence under attack at the time the petition is filed. *Lackawanna County Dist. Attorney v. Coss*, 121 S. Ct. 1567, 1572 (2001); *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (whether a petitioner is "in custody" is determined as of the date on which the habeas petition is filed); *Maleng*, 490 U.S. at 490-91 (citing *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)); *Port v. Heard*, 764 F.2d 423, 425 (5th Cir. 1985). Robinson's conviction for attempted manslaughter was vacated and set aside by the state trial court on December 15, 2007, over 18 months prior to the filing of his federal petition.

that he shot the gun into the car towards Kaylor at close range. The accomplice, Christian Hill, also testified that Robinson made known his intent to kill the victims, and that he tried to talk Robinson out of it.

This was the last reasoned decision on the issue since the Louisiana First Circuit and the Louisiana Supreme Court denied Robinson's subsequent writ application without reasons. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991).

A claim of insufficient evidence presents a mixed question of law and fact. *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The well established federal standard set forth in *Jackson*, 443 U.S. at 307, was cited by the state trial court in denying Robinson relief. The *Jackson* standard requires the court to determine whether, after identifying the elements of the offense as defined by state substantive law and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2000); *Gilley v. Collins*, 968 F.2d 465, 467 (5th Cir. 1992); *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991). The Court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *Guzman*, 934 F.2d at 82 (citing *Tyler v. Phelps*, 643 F.2d 1095, 1102 (5th Cir. 1981)).

In this case, Robinson was found guilty of attempted second degree murder. Second degree murder is defined in relevant part by Louisiana law as "the killing of a human being . . . when the offender has a specific intent to kill or to inflict great bodily harm." La. Rev. Stat. Ann. §

14:30.1(A)(1) (2009). The "attempt" element is defined by La. Rev. Stat. Ann. § 14:27, which provides, in pertinent part, that "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt . . . ."

The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. Ann. § 14:10(1) (2009). Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. *State v. Sharlhorne*, 554 So. 2d 1317, 1321 (La. Ct. App. 1989).

At trial, in relevant part, the jury heard the testimony of Gerrick Hammond, who had been with Robinson, Robinson's young son, and Hill most of the day, doing heroin and driving around in Robinson's blue car.[26] After they arrived at the mall in Houma, Hammond went into the mall to shop for athletic shoes. When he exited to return to the car, he saw Robinson with a gun in his hand, fussing with two white men.[27] Hammond ran away because he was already on probation and did not want to be involved.[28] As he was leaving the parking lot, he heard a shot. Soon, Hill and the young child drove up in Robinson's car and he got in to drive away.[29]

The jury also heard the testimony of Dr. Erny Hanson, an expert in the field of emergency medicine. Dr. Hanson testified that he treated Kaylor for injuries received after being pistol-

---

[26]St. Rec. Vol. 3 of 7, Trial Transcript (continued), 359-369, 11/4-6/02.

[27]*Id*. at 370.

[28]*Id*. at 370-71.

[29]*Id*. at 372.

whipped on the head and thrown in the back of a trunk.[30]  The doctor found Kaylor to have a starburst laceration to the right forehead and swelling and tenderness on the back of his scalp. Kaylor also had a laceration to his right neck from a gunshot, where the bullet grazed the neck.[31] Kaylor's entire back was bruised from a fall or being beating, or from riding in the trunk of a car.[32] Dr. Hanson had to use sutures to close the lacerations on his forehead and neck.[33]

Christopher Hill, the other assailant, also testified that he hung out with Robinson, who was his cousin, and Hammond during the day before they rode to the Houma mall in Robinson's car.[34] After parking the car in one place, Robinson told Hill to move the car closer to the store.[35]  After he moved the car, Hill and Hammond went into the mall.[36]  Robinson remained outside with his son.

Hill testified that, when he walked out of the mall later, he saw Robinson talking to two white men by the car.  As he approached, he saw one of the men get into the passenger side of a black car and the other man was arguing with Robinson on the driver's side of the car.[37]  He saw Robinson with a gun in his hand, and he heard Robinson tell the man to get into the car.[38]

---

[30]*Id.* at 389.

[31]*Id.* at 390, 393.

[32]*Id.* at 390, 392.

[33]*Id.* at 390.

[34]*Id.* at 397-98.

[35]*Id.* at 399.

[36]*Id.* at 400.

[37]*Id.* at 401.

[38]*Id.* at 401-02.

Hill stated that he tried to tell Robinson to calm down, that he would give him some money if he needed it, and that they were in a crowded part of the parking lot with cameras and people.[39] He told Robinson not to shoot the men.[40]  He was not sure if he told police that Robinson said he was going to kill the men, but he conceded that he could have said it in his statement to police.[41]  Hill further testified that he did not have a gun, and he did not see anyone with a gun other than Robinson.

During the incident, Robinson told Hill to take the keys and put the baby, that had accompanied them to the mall, into the black car.[42]  Hill decided that he did not want to be responsible for the baby getting hurt, so he walked with the baby to Robinson's car, which was parked in the next spot.[43]  As he moved, he noticed Robinson struggling with the driver or maybe both men in the car.[44]  Hill then heard a gunshot.[45]  He got into Robinson's blue car with the baby and drove off.  The last thing he saw was the passenger get out of the black car and head into the store.[46]  The man was holding his side like he had been shot.[47]  As the man got out of the car, he

---

[39]*Id.* at 402.

[40]*Id.* at 406.

[41]*Id.* at 403.

[42]*Id.* at 404-05.

[43]*Id.* at 405.

[44]*Id.* at 410.

[45]*Id.* at 405.

[46]*Id.* at 413.

[47]*Id.* at 415.

looked at Hill, and said he had been shot.[48]  Hill told him to go get help.  As Hill was leaving the parking lot in Robinson's car, he picked up Garrick Hammond near the exit.[49]

The jury also heard from a witness, Tressa Gros, who was at the mall when the incident occurred.  She testified that she was outside on a smoke break when she heard a commotion in front of the Rite Aid.[50]  She heard what sounded like a firecracker, and she saw a young man running to the Rite Aid.  He was screaming for help saying "I've been shot."[51]  Soon, two men drove up in a dark colored car and stopped right near her.[52]  The driver was yelling that he had to get his friend to the hospital.  The passenger had a gun pointed at the driver and cursed and yelled for him to drive away.[53]  After they drove off, she went into the Rite Aid and saw the man bleeding all over the floor.  She called for mall security.

Carrie Delorge also testified that she and her daughter arrived at the mall and parked in front of the Rite Aid.[54]  As she pulled in, her daughter heard a gunshot.  She did not believe her daughter at first, so she drove into a parking spot.  At that time, she saw a small black car in front of her with two white men in the front seat and another man coming over the back seat hitting the driver.  At some point, the white man on the passenger side got out of the black car screaming for help.  She

---

[48]*Id.* at 415-16.

[49]*Id.* at 405-06.

[50]*Id.* at 417.

[51]*Id.*

[52]*Id.* at 418.

[53]*Id.* at 418-19.

[54]*Id.* at 422.

became scared, so she drove off and her daughter called 911.[55]  She drove around to get the license number of the car they were in.  At that point, another man got out of the black car and got into a nearby car.[56]  She was able to get the license numbers of both cars.  As the black car drove off, the passenger in the car continued to hit the driver.[57]

Her daughter, Corrie Delorge, also testified that, when they drove up to park, she heard a gunshot.[58]  She saw a man outside of a black car beating up the driver, and another man was running to the Rite Aid yelling for help.  While the first man was still beating up the driver, the other man got into the passenger side of the black car.  After her mother drove around to get the license plate number, she saw that the men were all in the black car.[59]  At one point, one of the men got out of the black car, grabbed a baby off of the blue car, got into the blue car and drove away.[60]  As the black car drove off, the passenger continued to hit at the driver.[61]

The jury also heard the testimony of the other victim,  Ted Joseph Boudreaux, Jr.  He recalled that, when he and Kaylor were leaving the mall, there was a man standing next to Kaylor's car with a small child seated on the trunk of the car next to it.[62]  The car locks and handles on

---

[55]*Id*. at 423.

[56]*Id*. at 424.

[57]*Id*. at 425.

[58]*Id*. at 427.

[59]*Id*. at 428.

[60]*Id*.

[61]*Id*. at 430.

[62]*Id*. at 432-33.

Kaylor's car were altered, so that it could not be opened without the remote control.[63]  As they approached the car, Kaylor used the remote control to unlock the doors, which also pops open the doors and lowers the windows on both sides.  As they walked up to the car, the man put a gun in Kaylor's back and said "Get in, you're getting jacked, or something to that sort."[64]

Boudreaux stated that, as he was standing between the door and the car on the passenger side, a second man, later identified as Hill, walked up to him.[65]  He told Boudreaux to get into the car, so he complied.  Hill then walked over to the driver's side and told Robinson to just shoot them both.  Robinson then told the men to move the boxes and open the doors so they could all get into the car.

Boudreaux stated that he turned toward the back of the car to move the boxes and stall for time.[66]  Robinson then pushed Kaylor into the car and began pistol-whipping him across the head. The gun went off, and Boudreaux got out of the car to go to the Rite Aid.[67]  He told the cashier to call 911 because he had been shot and his friend was being kidnapped.  He knew Kaylor had a gun in the car, but he did not see him with it.[68]  He also stated that Kaylor's gun was not loaded.[69]

---

[63]*Id*. at 433.

[64]*Id*.

[65]*Id*. at 434.

[66]*Id*. at 435.

[67]*Id*. at 435.

[68]*Id*. at 437.

[69]*Id*. at 439.

Jason Kaylor, who was the victim, testified at trial that his car was customized for stereo sound competitions, with anti-theft protection, and with electronic game systems and monitors.[70] As he and Boudreaux approached his car, he saw a man, later identified as Robinson, with a small child standing at the car next to his.[71] He used two remote controls, one to disarm the alarm and one to pop open the doors.[72] As he stepped to get into the driver's seat, he felt an object in his back, and he heard a voice say "This is a carjack. Give me your car."[73]

He testified that he froze and thought maybe it was a joke by someone he knew. The man then said "This isn't a joke. I got a gun. Give me your car. This is a carjack."[74] The man shoved the gun in his back again. At that point, the other man, later identified as Hill, approached Boudreaux and told him to "open the back doors, we're going for a ride."[75] Kaylor tried to stall by pointing out that he had too much stuff in the back seat. At this time, Boudreaux leaned back from the front passenger seat to move things around while he was being watched by Hill.

While this was going on, Hill reached across and took the remote controls off of Kaylor's quick release key chain.[76] Robinson then told him to get in and start the car. Kaylor sat in the driver's seat, with his feet still out of the car, and started it.[77] At the same time, he pushed

---

[70] St. Rec. Vol. 4 of 7, Trial Transcript (continued), pp. 444-449, 11/4-6/02.

[71] *Id.* at 451.

[72] *Id.* at 451-52.

[73] *Id.* at 452.

[74] *Id.*

[75] *Id.*

[76] *Id.* at 453.

[77] *Id.* at 454.

Robinson's gun away and reached for his own gun under the seat. He pulled his gun out of the holster and chambered a round intending to turn and shoot it. He was not able to shoot because Robinson began struggling to get the gun. Boudreaux seemed to be struggling next to Kaylor but he did not know why. Robinson then hit Kaylor on the back of the head several times with his pistol and pulled the trigger.[78]

After the gun went off, Kaylor heard Boudreaux say he had been shot, and then he did not see him, Hill or the small child anymore. He did not know where they went. Robinson continued to hit Kaylor with his pistol until Kaylor finally gave up his gun.[79]

Robinson got in the passenger side and told him they were going for a ride.[80] Robinson directed Kaylor onto Highway 90 and told him to drive to Raceland, Louisiana.[81] Robinson continued to hit Kaylor with one pistol and had the other pistol aimed at Kaylor's torso.[82] For some reason, shortly after driving off, Robinson fired Kaylor's pistol into the glove compartment.[83]

Robinson told Kaylor to pass up the Raceland exit and instructed him to take off his shoes, which he did.[84] Robinson also took his wallet.[85] He continued to hit him on the head.[86] Kaylor

---

[78]*Id*. at 454.

[79]*Id*. at 455.

[80]*Id*.

[81]*Id*. at 457.

[82]*Id*. at 457-58.

[83]*Id*. at 458.

[84]*Id*. at 458-59.

[85]*Id*. at 460.

[86]*Id*. at 458.

tried to tell Robinson that they needed gas, but Robinson told him to keep driving.[87] Kaylor kept

offering to go to an ATM to get money. Robinson would hit him and tell him to shut up.[88]

They finally approached the Luling exit and drove over the Luling bridge. At that point,

Robinson told Kaylor to pull over half-way through the traffic circle. Robinson then told Kaylor

to get into the trunk.[89] Kaylor complied at gun point. He told Robinson that he could not fit.

Robinson continued to slam the trunk hood down until Kaylor was forced to fit between the

amplifiers.[90]

Kaylor continued to keep time on his watch and stay focused on the directions they took and

sounds he heard. After about 10 or 15 minutes, Robinson stopped somewhere and left the car for

about 30 minutes. He left the car and stereo running. The amplifiers in the trunk were getting hot

and began to burn Kaylor.[91] Kaylor could hear people commenting on the car, and he was afraid that

he would be killed.

Eventually, Robinson drove off again and Kaylor yelled to him that the amplifiers were

burning him. Robinson turned the stereo off, got out of the car, opened the trunk and told Kaylor

to shut up or he would shoot him. He closed the trunk and remained parked there with the car and

stereo turned off.[92] When Robinson returned about 15 minutes later, he became irate that the car was

locked and the alarm set itself. Kaylor told him that he needed the remote controls to get into the

---

[87]*Id.* at 458-59.

[88]*Id.* at 460.

[89]*Id.*

[90]*Id.* at 461.

[91]*Id.* at 462.

[92]*Id.* at 463.

car, but those were taken from him at the parking lot.  Kaylor had to yell instructions to him from the trunk on how to break-in to the car to bypass the alarm system.[93]  This turned the sound off on the alarm but the five red indicator lights continued to flash.

Robinson drove off again with the stereo playing.[94]  He eventually stopped for gas but left the stereo on so no one could hear Kaylor if he tried to yell.  The amplifiers continued to burn Kaylor's back.[95]  He also stopped at an ATM and made Kaylor give him the pin code for his debit car, or he would shoot him.[96]

Kaylor further testified that he began a plan to free himself by locating the cable release in the trunk.[97]  He eventually was able to locate the cable and pop the trunk latch.[98]  Robinson was still driving and did not seem to notice.

After getting some fresh air into the trunk, he discerned that they were on Airline Highway.[99]  Without opening the trunk too much, he attempted to flag down a car behind them to no avail.  After several hours, Robinson began driving periods without the stereo playing.  During this quieter time, Kaylor tried to talk with Robinson.  He told Robinson that he was a diabetic and needed his

---

[93]*Id.* at 464.

[94]*Id.* at 465.

[95]*Id.* at 466.

[96]*Id.* at 467.

[97]*Id.* at 467-70.

[98]*Id.* at 470.

[99]*Id.* at 471.

insulin.[100]  He also told him that he had a wife and two kids hoping to gain his sympathy.[101]  None of this was true.[102]

As Kaylor continued to complain that he was getting weak and needed insulin, Robinson pulled over twice.  At these stops, Kaylor would close the trunk back down to look like he had not opened it.  Robinson would get out of the car and open the trunk to looked at him.  He would simply close the trunk and drive off again.[103]

Around 2:00 a.m., Robinson asked Kaylor how to turn the flashing alarm indicator lights off.  Kaylor knew that he needed the remote, but he told Robinson he would have to get out to see what to do.[104]  Robinson stopped the car and opened the trunk.  By this time, Kaylor's leg had gone numb and his right eye had a pool of blood in it preventing him from seeing out of it.  Robinson had to help him out.

Once he was out, Kaylor told Robinson that he needed the remote control to turn off the lights.[105]  Robinson then told Kaylor to get back in the trunk.  Kaylor begged him to let him go.  Robinson then told him to clean up his face and sit in the front seat of the car.  Kaylor asked him again to let him go.  Robinson then told him to run into the woods.

As Kaylor ran, Robinson jumped into the car and drove back in the direction they came.  Kaylor ran back to the road and kept running in the opposite direction.  He stated that he hid every

---

[100]*Id.*

[101]*Id.* at 472.

[102]*Id.* at 472.

[103]*Id.*

[104]*Id.* at 473.

[105]*Id.* at 474.

time a car came by for fear it was Robinson returning to kill him. After about one mile, he found a pay phone and called 911.[106]

The evidence and testimony was more than sufficient for a reasonable jury to find that Robinson had the specific intent to kill Kaylor when he shot at him during the initial struggle in the car. Under Louisiana law, specific intent to kill can be inferred from a shooting that occurs at a fairly close range. *State v. Corkern*, 897 So. 2d 57, 60 (La. Ct. App. 2004) (citing *State v. Cummings*, 771 So. 2d 874, 876-77 (La. Ct. App. 2000)). The Louisiana Supreme Court has repeatedly held that deliberately pointing and firing a deadly weapon at close range are circumstances that will support a finding of a specific intent to kill. *State v. Broaden*, 780 So. 2d 349, 362 (La. 2001) ("Undoubtedly, placing a shotgun to the heads of individuals and pulling the trigger supports findings of specific intent to kill beyond a reasonable doubt."), *cert. denied*, 534 U.S. 884 (2001), *reh'g denied*, 534 U.S. 1172 (2002); *State v. Tassin*, 536 So. 2d 402, 411 (La. 1988), *cert. denied*, 493 U.S. 874 (1989); *State v. Williams*, 383 So. 2d 369 (La. 1980), *cert. denied*, 449 U.S. 1103 (1981); *State v. Procell*, 365 So. 2d 484 (La. 1978); *see also State v. Dubroc*, 755 So. 2d 297, 303-304 (La. Ct. App. 1999). Robinson held his gun to Kaylor's head and shot the gun while in a hand-to-hand struggle with Kaylor in the front seat of the car. This close range shooting, which grazed Kaylor's neck and actually struck Boudreaux, was sufficient to support the jury's finding of a specific intent to kill Kaylor.

The evidence in this case was more than sufficient to support the verdict of attempted second degree murder of Kaylor. The state courts' denial of relief on this claim was not contrary to or an unreasonable application of *Jackson*. Robinson is not entitled to relief on this claim.

---

[106]*Id.* at 475.

## VI.    **Improper Jury Instruction**

Robinson alleges that the Trial Court erred in instructing the jury on the definition of second degree murder, which is defined as the specific intent to kill or to commit great bodily harm. However, he argues, under Louisiana law, a verdict can not be based on an intent to inflict great bodily harm. As such, he argues, the jury charge did not include a clarification of that nature and the jury's verdict was based on the evidence tending to show the infliction of great bodily harm and not an intent to kill.

Robinson first raised this claim in his application for post-conviction relief to the state trial court. The Court denied relief finding that, while the jury charge was deficient, any error was harmless because the record supported the conclusion the jury's verdict was based on a specific intent to kill. This was the last reasoned decision on the issue. *Ylst*, 501 U.S. at 802.

In reviewing alleged constitutional errors in state jury instructions, the federal habeas court must determine whether the erroneous instruction so infected the entire trial that the resulting conviction violates due process. *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The inquiry is not merely whether the instruction is undesirable, erroneous, or even universally condemned. *Id*. at 887. "An omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Id*. at 887 (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

In Robinson's case, the trial court's instruction to the jury on the definition of second degree murder read as follows:[107]

> "Second degree murder" is the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm or when the offender is

---

[107]St. Rec. Vol. 4 of 7, Trial Transcript (continued), p. 671, 11/4-6/02.

engaged in the perpetration or attempted perpetration of aggravated kidnaping or second degree kidnaping, even though he had no intent to kill or inflict great bodily harm.

I have already defined aggravated kidnaping, second degree kidnaping and attempt.

Thus, in order to convict the defendant of attempted second degree murder, you must find that the defendant committed an attempt, as previously defined, to commit second degree murder.

Specific criminal intent is required for the crime of attempted second degree murder.

In order to convict the defendant of attempted second degree murder, you must find that the State proved beyond a reasonable doubt every element of attempted second degree murder.

The Court went on to explain and define attempted manslaughter as a lesser offense. The Court also later repeated this definition, and the definition of manslaughter at the request of the jury during deliberations.[108]

Robinson concedes that this is an accurate definition of second degree murder. He contends, however, that the trial court did not explain that intent to commit great bodily harm was not sufficient to prove attempted second degree murder under state law.

Under Louisiana law, it has long been resolved that, while intent to inflict great bodily harm is an element of second degree murder, it is not to be considered in obtaining a conviction for attempted second degree murder. *State v. Butler*, 322 So. 2d 189 (La. 1975). Under Louisiana law, failure properly to charge the jury on that point is a trial error subject to harmless error review as defined in *Sullivan v. Louisiana*, 508 U.S. 275 (1993). *State v. Hongo*, 706 So. 2d 419, 420-421 (La. 1997). Harmless error itself is a mixed question of law and fact. *Lowery v. Collins*, 988 F.2d 1364, 1372 (5th Cir. 1993) (pre-AEDPA discussion of *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

---

[108]*Id.* at 689.

The harmless error standard used by the state trial court in denying Robinson's claim was in accord with that set forth by the United States Supreme Court in *Brecht* for post-conviction review. 507 U.S. at 637-38. In *Brecht*, the Supreme Court held that a trial error occurring during the presentation of the case to the jury is subject to harmless error analysis because it can be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial. *Brecht*, 507 U.S. at 629-30; *Johnson v. Cain*, 215 F.3d 489, 495 (5th Cir. 2000); *Laboa v. Calderon*, 224 F.3d 972, 977 (9th Cir. 2000); *Lowery v. Anderson*, 225 F.3d 833, 841 (7th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001).

In making the assessment, the reviewing court must determine whether the erroneous jury instruction had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623; *Robertson v. Cain*, 324 F.3d 297, 304 (5th Cir. 2003). The petitioner may prevail in a federal habeas corpus proceeding only if there is grave doubt as to the harmlessness of the error. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). According to the United States Fifth Circuit Court of Appeal, "if our minds are 'in virtual equipoise as to the harmlessness' under the <u>Brecht</u> standard, of the error, then we must conclude that it was harmful." *Robertson*, 324 F.3d at 304 (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting *O'Neal*, 513 U.S. at 435)).

As outlined in great detail in the prior section of this Report, the jury heard the testimony and received evidence that Robinson shot Kaylor at close range, demonstrating under Louisiana law a specific intent to kill. Robinson suggests that the jury could have found that the gun discharged

accidentally during the struggle.[109]  As alluded to by the state courts when addressing sufficiency of the evidence, that would have triggered the jury to return a verdict of attempted manslaughter, which they did not.  Since the verdict was one of attempted second degree murder, and in light of the evidence addressed above, the verdict must have been based on the finding of a specific intent to kill.

Furthermore, the jury also heard testimony from the various witnesses, including the victim, that Robinson threatened to shoot Kaylor and kept the gun constantly pointed at him.  The evidence also showed that Robinson said he intended to kill both men.  The jury's decision to give credit to that testimony must be respected.

Based on the evidence presented at trial, it cannot be said that the reference to great bodily harm by the state trial court had a substantial and injurious effect or influence in determining the jury's verdict.  The testimony at trial established that Robinson voiced his intent to kill Kaylor and pulled the trigger in close range, sufficient to graze his neck with the bullet.  Robinson has not established a "grave doubt" in the mind of this court as to the finding that the error was harmless.

The state trial court's finding of harmless error is not contrary to or an unreasonable application of *Brecht*.  Robinson is not entitled to relief on this claim.

## VII.    Ineffective Assistance of Counsel

Robinson alleges that his trial counsel was ineffective for failure to object to the second degree murder definition used in the jury charges.  This claim was also raised in Robinson's application for post-conviction relief to the state trial court.  Citing *Strickland v. Washington*, 466 U.S. 668 (1984), the Court found that counsel's failure to raise the objection to the charge was not

---

[109]Rec. Doc. No. 1-2, pp. 23, 25.

prejudicial to the outcome of the case, since the evidence proved a specific intent to kill.  This was the last reasoned decision on this issue.  *Ylst*, 501 U.S. at 802.

The issue of effective assistance of counsel is a mixed question of law and fact.  *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or unreasonably applied the United States Supreme Court decision in *Strickland* to the facts of Robinson's case.

In  *Strickland*, the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *See Strickland*, 466 U.S. at 697.  To meet the burden of proving ineffective assistance of counsel, petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  "The defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all of the circumstances.  *See Strickland*, 466 U.S. at 689.  "[I]t is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of

reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Furthermore, "[t]o meet the prejudice prong, the [petitioner] must affirmatively prove, and not merely allege, prejudice." *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *Theriot v. Whitley*, 18 F.3d 311, 314-15 (5th Cir. 1994). In this context, a reasonable probability of prejudice is "a probability sufficient to undermine confidence in the outcome." *Id.* In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Kimler*, 167 F.3d at 893. On habeas review, scrutiny of counsel's performance "must be highly deferential" and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689-90); *Mattheson*, 751 F.2d at 1441.

A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' But it is not enough, under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting *Strickland*, 466 U.S. at 693). Thus, conclusory allegations of ineffective

assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000) .

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Therefore, this Court must determine whether the state court's failure to grant relief was contrary to, or an unreasonable application of, *Strickland*.

In Robinson's case, the state trial court relied on precedent from the Louisiana Supreme Court which established that the failure by trial counsel to object to the inclusion of intent to inflict great bodily harm language in an attempted second degree murder charge is *per se* deficient performance under *Strickland*. *Hongo*, 706 So. 2d at 422. The Trial Court recognized counsel's failure to object as deficient performance and focused on resolving whether Robinson was prejudiced by the error.

In doing so, the Trial Court considered whether the evidence was sufficient to support the verdict or if counsel's error prejudiced that verdict, similar to and reliant upon its findings in the harmless error discussion. After examining the evidence and testimony again, the Trial Court determined that the testimony and evidence were focused on Robinson's specific intent to kill the victim and not on a mere intent to inflict harm. Finding no prejudice to the defendant, the court concluded that counsel's failure to object to the errors did not constitute ineffective assistance.

The state court relied upon its harmless error analysis to determine that Robinson failed to establish the prejudice prong of *Strickland*. Thus, to evaluate the state court's application of *Strickland* and its prejudice prong, this court would be called upon to review the state court's harmless error analysis. The Court has done so in addressing Robinson previous claim challenging

the jury charge itself. This Court has resolved that the harmless error analysis was not contrary to, or an unreasonable application of, federal law. In doing so, this Court has resolved that the jury charge error did not prejudice the verdict. "If an error is shown to be harmless, then the error cannot satisfy the prejudice prong of *Strickland*." *Johnson v. Blackburn*, 778 F.2d 1044, 1050 (5th Cir. 1985).

Given the finding that the charge as given was harmless error, Robinson cannot establish that counsel's failure to object to the charge was prejudicial under *Strickland*. *Id.*; *Riggins v. Butler*, 705 F. Supp. 1205, 1212 (E.D. La. 1989). The state trial court's denial of relief was not contrary to or an unreasonable application of *Strickland*. Robinson is not entitled to relief on this claim.

## VIII.  <u>Recommendation</u>

For the foregoing reasons, it is **RECOMMENDED** that Dominic L. Robinson's petition for issuance of a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[110]

New Orleans, Louisiana, this 18th day of March, 2010.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[110]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.